# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CHARLES SANDERSON, III INDIVIDUALLY,
AND AS TRUSTEE OF THE BOSTON HILL
REALTY TRUST
                    PLAINTIFFS

v.                                                    NO:

DAVID G. MASSAD, PAMELA MASSAD,
COMMERCE BANK AND TRUST COMPANY,
GEMSTONE INVESTMENT CO., INC.
                    DEFENDANTS

## COMPLAINT AND JURY DEMAND

### NATURE OF THE CASE

1.      This is an action for damages arising under the Racketeer Influence and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Additionally, the

action includes claims under Massachusetts law. The predicate acts supporting the

RICO counts include, mail fraud, bank fraud, obstruction of justice, loan sharking and

extortion. The facts alleged also indicate violations of the Truth in Lending Act, the

Real Estate Settlement Procedures Act, and Massachusetts General Law c. 93A.

2.      This RICO enterprise has been directed and controlled by defendants David

G. Massad (" D. Massad") and  Pamela Massad ("P. Massad); their lending

companies Gemstone Investment Company, Inc. ("Gemstone") and Commerce Bank

and Trust Company, ("Commerce") which the Defendants have used, controlled,

and directed to commit these illegal acts, are also members of the enterprise.

3.      It is alleged that all of the defendants acted in concert to defraud, extort, conspire
against and deprive the Plaintiffs of monies, property and assets. In addition, the
defendants have tried to dissuade the Plaintiffs from filing the present action by
threatening to bring, a lawsuit in the State Courts for Massachusetts attempting to
prevent the Plaintiffs for seeking redress of their disputes in Federal courts all in
violation of the Massachusetts anti-SLAPP statute, M.G.L. c. 231 §59H.

4.      Defendants  D. Massad and  P. Massad through their lending entity,
Gemstone, loaned money to individual and entities and proceeded to charge interest
rates far in excess of the contractual amount, in violation of Massachusetts usury
laws. This scheme was designed to effectively strip the property of its equity and
force the borrowers into foreclosure. The defendants used the threat of foreclosure
and economic duress to force the borrowers to agree to their fraudulent loan terms.
In addition, the defendants used their position to force borrowers to pay them
kickbacks.

## PARTIES

5.      Plaintiff Charles Sanderson, III ("Sanderson") is an individual who resides in
Kingston, Massachusetts.

6.      Plaintiff  Boston Hill Realty Trust ("Boston Hill") is a trust established
under the laws of the Commonwealth of Massachusetts under declaration of
trust dated May, 2000 and recorded in the Worcester County Registry of
Deeds at Book 22598, page 161.

7.      Defendant David G. Massad is an individual who resides in Westborough, Massachusetts.

8.      Defendant Pamela Massad ("Pamela Massad") is an individual who resides in Westborough, Massachusetts.

9.      Defendant Commerce Bank and Trust Company ("Commerce Bank") is a federally insured financial institution headquartered in Worcester, Massachusetts.

10.     Defendant Gemstone Investment Company, Inc. is a Corporation formed under the laws of the Commonwealth of Massachusetts with a principle place of business at Worcester, Massachusetts.

### Facts Common to All Counts

14.  Nicholas J. Fiorillo ("Fiorillo") is an individual who resides in Worcester, Massachusetts. Fiorillo is party to two similar actions (*Fiorillo v. Gamewell*, C.A. # 07-40015-FDS and *Krowel, et al. v. Massad et al.*, C.A. # 07-40122-FDS), and has been victimized by the same RICO conspiracy described below.

15.  Tracy Krowel is an individual who resides in Worcester, Massachusetts. Krowel is party to two similar actions (*Fiorillo v. Gamewell*, C.A. # 07-40015-FDS and *Krowel, et al. v. Massad et al.*, C.A. # 07-40122-FDS), and has been victimized by the same RICO conspiracy described below.

16.  Robert Depietri Jr. is an individual who resides in Worcester, Massachusetts. R. Depietri is party to a similar action (*Depietri v. Massad*, C.A. # 07-40267-FDS), and has been victimized by the same RICO conspiracy described below.

17.  Kimberly Depietri  is an individual who resides in Worcester, Massachusetts. K. Depietri is party to a similar action (*Depietri v. Massad*, C.A. # 07-40267-FDS), and has been victimized by the same RICO conspiracy described below.

18.  At all relevant times, the Plaintiffs,  Sanderson and Boston Hill were engaged in the acquisition and development of  a commercial and residential properties real estate development at the intersection of Route 9 and Route 20 in the towns of Westborough, Shrewsbury and Northborough (hereinafter references as "Property").

19.  At all relevant times, defendant Massad was the majority shareholder and Chairman of defendant Commerce Bank. On information and belief, defendant Massad also is a major financier of, and holds a significant ownership interest in, defendant Gemstone.

20.     At all relevant times, defendant Pamela Massad was an attorney licensed to practice law in the Commonwealth of Massachusetts. Defendant Pamela Massad is the daughter of defendant Massad and was the only officer and director of Defendant Gemstone.

**<u>The Dorothy Valente Loan</u>**

21.     On or about May 16, 2000, as the Trustee of the Boston Hill Realty Trust, (Boston Hill), Sanderson purchased approximately one hundred twenty five contiguous acres of real property located in three towns, Shrewsbury, Northborough and Westborough Massachusetts at the intersection of Route 9 and Route 20 (hereinafter The Property) from Dorothy Valente and Norman E. Morrison for the sum of $4,000.000.00.

22.     Sanderson paid Valente and Morrison $750,000.00 and he executed a

Promissory Note and Mortgage in favor of the Sellers  (Valente and Morrison) in the principle amount of  Three Million, Two Hundred-Fifty Thousand Dollars ($3,250,000.00) (hereinafter "Valente Note").

23.     The Note called for a balloon payment of the entire principle on November 15, 2000.

24.     Because the financing was short term Sanderson immediately set out to find permanent financing for the project which would retire the Valente Note and which would provide Boston Hill with the capital that it needed to perform testing and engineering, construct a roadway on the property and install utilities.

25.     Because of the size of the Property Sanderson knew that he would need to be able to sell individual parcels and obtain releases from the financing on a lot-release basis.

26.     Sanderson was introduced to the D. Massad who told him that the Commerce Bank would be interested in financing the Boston Hill project.

27.     Unknown to Sanderson at the time D. Massad had intended to use his loan to me to take the Property from Boston Hill.

28.     D. Massad told his associate and employee that the Boston Hill property was one of the most desirable and import commercial projects in Central Massachusetts and that he (D. Massad) intended to own the project.

29.     D. Massad told one of his associates and employees that he had a "sucker", who D. Massad intended to allow to construct the roadway and do all of the work of developing the commercial sub-division and then take the property from

Boston Hill in a foreclosure.

30. On September 25, 2000, the Defendant Commerce Bank issued Boston Hill an "Expression of Interest" letter indicating that it would loan Boston Hill $4,750,000.00.

31. On October 4, 2000, the Commerce Bank issued a commitment letter to Boston Hill committing to finance the project and to give Boston Hill a mortgage for $4,750,000.00 at a rate of 9.5% annual interest.

32. These letters were mailed to Boston Hill through the United States Postal Service.

33. Subsequently Commerce Bank refused to provide the financing to Boston Hill.

34. Because Sanderson had relied upon the Commerce Bank commitment, he had not obtained alternate financing.

35. Boston Hill and Sanderson defaulted upon the Valente Note. Fletcher Tilton and Whipple, the law firm of  P. Massad, brought suit against us on behalf of Valente and Morrison.

36. On or about March 2002 after the suit had been filed D. Massad met with Sanderson and told him that he had some of his own personal money that he would loan Boston Hill to pay off the Valente Note.

37. D. Massad said that the interest rate would be 15% annually. Sanderson and Boston Hill was under tremendous financial distress so Sanderson agreed to borrow the money from D. Massad.

38.    D. Massad told Sanderson to negotiate the payoff of the mortgage, to see if the note could be paid off for less than full face value.

39.    Sanderson  called Robert Yale of Comvest Realty in Northborough Massachusetts to contact Valente and Morrison to see if Boston Hill could get an agreement to pay-off the Valente Note for a discount.

40.    Yale called Sanderson back and said that Valente and Morrison had agreed to accept  $2,600,000.00

41.    Yale was working closely with the firm of Fletcher Tilton and Whipple at the time on a number of deals.

42.    Sanderson met with D. Massad and told him the good news about the discounted Valente Note.

43.    Unknown to Sanderson at the time Gemstone had purchased the Promissory Note from Valente back on November 19, 2001.  D. Massad  had concealed this fact from Sanderson by not recording the assignment of Mortgage until April 2002.  D. Massad waited six months before placing the $3,250,000.00 assignment of mortgage on record.

44.    After the recording of the Assignment of Mortgage Sanderson discoved  that the note was purchased by P. Massad's corporation, Gemstone .  P. Massad, is an attorney at the law firm who had brought a lawsuit against us on behalf of Valente and Morrison.

45.    At the time Gemstone purchased the Valente Note, it was already in default.

46.    Sanderson expressed  his concern to D. Massad that the Valente Note was

already in Default, and that he had an opportunity to purchase the Note at a deep
discount.

47.    D. Massad assured Sanderson not to worry about the term of the note or the
fact that the note was in excess of the amount actually paid by Gemstone.

48.    D. Massad assured Sanderson that the transaction would work the same as the
transaction that Gemstone had agreed to and that he would release the mortgage
upon the payment of $2,600,000.00.

49.    Unknown to Sanderson at the time the purchase of the note was part of a
scheme by the Defendants to deprive Boston Hill of the Property.

### $2,900,000.00 Loan to Boston Hill

50.    On or about February 22, 2002 Gemstone made a loan in the about of
$2,900.00.00 to Boston Hill at a stated interest rate of 15% annually.

51.    Subsequent to the loan closing Gemstone refused to advance any funds to
Boston Hill directly.  Instead Gemstone retained the money in escrow and
dispersed the money to creditors of Boston Hill through P. Massad.

52.    The total amount advanced by Gemstone under this note was $2,000.000.00.

53.    The Additional $900,000.00 constituted an undisclosed interest charge to
Boston Hill.

**The Gemstone Investment Company Deed**

54.     On or about February, 2002 the D. Massad approached Sanderson concerning the conveyance of certain lands belonging to Boston Hill for the construction of a banking location for Commerce Bank.

55.     D. Massad told Sanderson that Commerce Bank needed the land and the he would deed the land back to Boston Hill if he did not construct a bank on the property.

56.     D. Massad refused to loan Boston Hill the money that it needed to complete the road construction unless Boston Hill gave him the land for free.

57.     In February 2002, under the duress and coercion of D. Massad, Sanderson deeded land on Route 20, the lost shown as lot 5C on a plan of land prepared by Waterman Design Associates, dated October 31, 2002 for no consideration directly to D. Massad

58.     On or about June 23, 2004 D. Massad forced Sanderson to sign a second, confirmatory deed, again for no consideration but this time to Gemstone.

59.     Defendants gave Boston Hill no credit for the conveyance of this property against the amounts due on the notes.  In reality the lot was an additional fee imposed upon Boston Hill for the $2,900,000.00 loan.

60.     Gemstone has repeatedly attempted to foreclose on the Property.  There is currently a foreclosure sale scheduled for June 5, 2008 which constitutes the fourth scheduled  foreclosure sale on the Property.

61.     Boston Hill filed two separate Chapter 11 Bankruptcy petitions in an attempt

to reorganize the transaction.

62.     Because of the problems, both legal and financial, created by the actions of

the Defendants the Property has numerous attachments and mortgages and

financial reorganization or sale of the Property is not possible without the good-

faith participation of Gemstone.

63.     On many occasions, Boston Hill has requested an accounting and payoff

figure for the funds that Boston Hill owes to Gemstone.

64.     D. Massad and P. Massad have refused to give me an accounting or a

legitimate payoff figure.

### The Wes-Pac Purchase and Sale Agreement

65.     At all times D. Massad had represented to Sanderson that he would release

the lots of the commercial sub-division on a "lot release" basis.  That is to say

that D. Massad agreed to release individual lots as they were sold without Boston

Hill paying off the entire debt.

66.     There were eight lots along Route 20 and Walnut Street in Shrewsbury,

Massachusetts.

67.     D. Massad had agreed with Sanderson to release each of these lots upon the

payment of $250,000.00, per lot, and allowing Boston Hill retain the excess for

the purpose of funding the remainder of the construction project.

68.     Had D. Massad followed through with his agreement he would have been

repaid two million dollars from the sale of these lots and allowed Boston Hill to

retain enough money to completely finish the work necessary for the project.

10

69.     Based upon the promises of D. Massad Sanderson set about to sell the lots
along Route 20.

70.     The first deal Sandrson made for Boston Hill was with Wes-Pac for the sale
of approximately two acres of land for the sum of $1,140,000.00.

71.     D. Massad was involved in the initial and in many of the subsequent meeting
with Wes-Pac.

72.     D. Massad agreed to release theWes-Pac lot on a lot-release basis upon the
payment of $250,000.00, pursuant to his understanding with Sanderson.

73.     Wes-Pac went to the Town of Shrewsbury and obtained all of the necessary
permits to construct a Shell Gasoline Station.

74.     Wes-Pac engaged professionals to performed engineering, take core samples,
make architectural drawings and expended substantial funds getting the permits
for the construction of the station.

75.     Ultimately, D. Massad refused to follow through with his deal and he refused
to release the lot.

76.     The deal ultimately failed as a result of the actions of D. Massad.

77.     Wes-Pac has brought an action against Boston Hill in the State Courts of
Massachusetts to recover its costs related to this project.


**The Abu Construction Inc. Purchase and Sale Agreement**

78.     On or about December 2, 2003 Boston Hill entered into a purchase and sale

agreement with Abu Construction, Inc. for the sale of a parcel of the Property which we had set aside as a residential sub-division for the sum of $2,000,000.00.

79.    D. Massad agreed to release the land for $1,000,000.00 and agreed to allow us to retain $1,000,000.00 from the proceeds of the sale.

80.    D. Massad was involved in the meetings for the sale of the property.

81.    Abu Construction Inc. posted a deposit to be held in escrow and obtained all necessary permits for the construction of the residential sub-division.

82.    Abu expended substantial funds in obtaining permits from the Town of Shrewsbury.

83.    When the parties were ready to close the transactions D. Massad and P. Massad refused to release the lot..

84.    D. Massad had once again failed to follow through on his promises to Sanderson.

85.    As a direct result of the actions of D. Massad and P. Massad, Boston Hill was unable to deliver clear title to Abu and was forced to return the deposit.

## The Cadette Purchase and Sale Agreement

86.    On or about September 18, 2003 Boston Hill entered into an agreement with George Cadette for the sale of a lot for the construction of a Dunkin-Donuts shop for the sum of $500,000.00.

87.     This lot was one of the eight lots that D. Massad had agreed to release for $250,000.00, per lot.

88.     Cadette worked to obtain the necessary permits and performed his due diligence on the property.

89.     When the parties were ready willing and able to close the transactions the Defendants A. Massad. P. Massad refused to release the lot from the mortgages.

90.     As a direct result of the Defendants' action Boston Hill was unable to deliver clear title to Cadette and was forced to return the deposit.


### The RWW Management Company Purchase and Sale Agreement

91.     On or about December 18, 2003 the Boston Hill entered into an agreement with RWW Management Company for the sale of approximately five acres of land for the construction of a Mercedes Benz dealership for the sum of $1,800,000.00.

92.     This property was comprised of three of the Route 20 lots that D. Massad had agreed to release for $250,000.00.

93.     D. Massad agreed to release the land from the mortgages on a lot release basis in consideration of $750,000.00.

94.     RWW Management performed its due diligence on the land necessary to obtain its permits.

95.     When the parties were ready willing and able to close the transactions the

Defendants A. Massad. And P. Massad refused to release the lots from the mortgages.

96.    As a direct result of the Defendants' action Boston Hill was unable to deliver clear title to RWW Management and was forced to return the deposit.

## Th First Hartford Purchase and Sale Agreement

97.    On or about April 1, 2004 the Boston Hill entered into an agreement with First Hartford Realty Corporation for the sale of approximately eighty-eight acres for the sum of $13,000,000.00.

98.    The agreement gave the Purchaser First Hartford time to perform substantial and expensive engineering on the property.

99.    Because the Defendants had breached the agreement with Sanderson to release the lots along Route 20 Boston Hill did not have funds necessary to comply with its agreement with First Hartford.

100.   The agreement required Boston Hill to complete construction of the roadways, install a traffic light and finish the improvements to Route 20 required by the town.

101.    As a direct result of the actions of the Defendants Plaintiffs were forced into default of their agreement with First Hartford.

102.   First Hartford brought a lawsuit against Boston Hill. Sanderson was forced to place a mortgage on his home to pay First Hartford approximately $500,000.00.

## COUNT I: CIVIL RICO (18 U.S.C. §1961 et seq.)

103.  The plaintiffs repeat and reiterate each and every allegation set forth
above and incorporate such allegations into this count.

104.  At all pertinent times, the defendants D. Massad, P. Massad,
Gemstone and  Commerce Bank, combined to form an "enterprise" as
that term is defined at 18 U.S.C. §1961(4) ("the Massad Enterprise").
Each of the defendants were members and associates of the Massad
Enterprise that was engaged in fraudulent real estate transactions, and
the procurement of fraudulent financing for such transactions through
mail fraud, wire fraud, bank fraud, loansharking, and extortion. The
Massad Enterprise utilized its connection to legitimate banking
institutions to enrich its individual members. At all pertinent times the
Massad Enterprise was an organized crime group that operated in
central Massachusetts and at all pertinent times, it constituted a
continuing unit for the common purpose of achieving the enterprise's
objectives.

105.  At all pertinent time the Massad Enterprise was engaged in
interstate commerce.

106.  The Massad Enterprise is a group of individuals and corporations
associated in fact, although it is not a legal entity. The means and
methods utilized to conduct its organized crime activity included a
pattern of extortion, threats, intimidation and economic duress, which
had the effect of fraudulently transforming conforming loans into
usurious ones. The unlawful actions of the defendants occurred on a
continuing basis from at least 2001 to the present. The defendants have

conspired to defraud and extract large sums of money and valuable real property from the plaintiffs by engaging in the pattern of activity that consists of numerous crimes as set forth below.

107.   The purpose of the enterprise was as follows:

    a.      to enrich its members;

    b.      to preserve, protect, and augment its financial power and leverage in central Massachusetts.

108.   Among the means and methods employed by the members and associates of the Massad Enterprise in the conduct of the enterprise were the following:

    a.      members and associates conspired committed and attempted to commit mail fraud and bank fraud through control of numerous lending institutions and companies involved in real estate transactions;

    b.      members and associates engaged in extortionate acts to enrich its members;

    c.      members and associates obstructed and attempted to obstruct justice to prevent victims of the Massad Enterprise from seeking redress in the courts.

109.   The individual members of the Massad Enterprise would cause the corporate members to write loan commitment to the plaintiff. When the loans were about to close, the defendants would withdraw the offer of financing and them offer the plaintiff loans, the terms of which were substantially less favorable to the Plaintiffs and which transactions were intended to deprive the Plaintiffs of the real estate loan upon.

110.   The individual members of the Massad Enterprise would lull the Plaintiff into a

false sense of security by approving transactions and promising to the release of parcels of real estate from the financings only to later back out of theses agreements.  This pattern of behavior was intended to impose severe economic duress on the Plaintiffs so that they would be unable to repay the loans and that the Massad Enterprise would be able to obtain the real property by foreclosure.

111.   The individual members, on one occasion, also use the economic duress to compel the Plaintiff to convey valuable real property to the Massad Enterprise at no consideration.

112.   In at least one instance, in or around May 2000, some or all of the defendants extorted a debt from Boston Hill that was statutorily usurious, in violation of G.L. c. 271 §49 and 18 U.S.C. §1961(6). Specifically, the debt was in the amount of $2,900,000.00 was at the stated rate of interest of 15%. The funds advanced were totaled only $2,000,000.00, the extra $900,000.00 constitution an undisclosed up front fee. The effective interest rate for the first year of 46.03% was well more than twice the maximum amount of twenty per cent authorized by G.L. c. 271 §49. One or more members of the Massad Enterprise persisted in efforts to collect this usurious debt.  P. Massad would mail out payments and checks to creditors of Boston Hill

113.   The Defendants jointly and severally have conducted the affairs of said Massad Enterprise through the aforesaid pattern of racketeering activity.  Specific racketeering acts undertaken include but were not limited to:

**a.**    Mail Fraud To Obtain Real Property or Money with respect to the Valente Note, one or more of the defendants, including defendants D. Massad and P. Massad, having devised a scheme or artifice to defraud and to obtain money or property by means of false and fraudulent pretenses representations and promises concerning material facts and matters, for the purpose of executing and attempting to do so placed and caused to be placed in post offices and authorized depositories for mail matter, matter and things to be sent by the United States Postal Service or by private or commercial interstate carrier, and took and received therefrom, such matter and things and knowingly caused to be delivered by the United States Postal Service mail or by private or commercial interstate carrier according to the directions thereon such matter and things , to wit: various documents including loan demand letters, in violation of 18 U.S.C. § 1341.

**b.**    Extortion to Obtain the Deed the June 2004 Deeds or about June, 2004, one or more of the defendants, including defendants P. Massad and D. Massad, did obtain property from Boston Hill, to wit, a lot of land situated  on the southeasterly side of Route 20 in Shrewsbury, Massachusetts, with their consent, induced by wrongful use of actual or threatened fear including fear of economic loss, and by such acts attempted to obtained property to which they were not lawfully entitled all in violation of 18 U.S.C. §1951 and M.G.L. c. 275 §25.

**c.**     Mail Fraud to Obtain Payment of $900,000.00 in Fraudulently Inflated Interest in Connection with the $2,900,000.00 loan. On or about February 22, 2001, one or more of the defendants, including defendant D. Massad and P. Massad having devised a scheme or artifice to defraud and to obtain money or property by means of false and fraudulent pretenses representations and promises concerning material facts and matters, for the purpose of executing and attempting to do so placed and caused to be placed in post offices and authorized depositories for mail matter, matter and things to be sent by the United States Postal Service or by private or commercial interstate carrier, and took and received therefrom, such matter and things and knowingly caused to be delivered by the United States Postal Service mail or by private or commercial interstate carrier according to the directions thereon such matter and things , to wit: loan closing documents from the $2,900.000.00 loan 18 U.S.C. § 1341.

**d.**     Mail Fraud to Obtain Real Property which constituted Fraudulently Inflated Interest in Connection with the $2,900,000.00 loan.

On or about February  2001, one or more of the defendants, including defendant D. Massad and P. Massad having devised a scheme or artifice to defraud and to obtain

money or property by means of false and fraudulent pretenses representations and

promises concerning material facts and matters, for the purpose of executing and

attempting to do so placed and caused to be placed in post offices and authorized

depositories for mail matter, matter and things to be sent by the United States Postal

Service or by private or commercial interstate carrier, and took and received therefrom,

such matter and things and knowingly caused to be delivered by the United States

Postal Service mail or by private or commercial interstate carrier according to the

directions thereon such matter and things , to wit: deed and documents for the

conveyance of the Deed and the $2,9000,000.00 loan in violation of  18 U.S.C. § 1341.

**e.**     **Loan Sharking to Obtain the Boston Hill Property.**

> Commencing on or about September 2000, one or more of the defendants,
>
> including defendants. D. Massad and P. Massad, participated and conspired
>
> to participate in the use of extortionate means fraud, deceipt and economic
>
> duress, in an atempt to deprive the Plaintiffs of their interest in the Boston
>
> Hill Property in lieu of payment of the  Vallente Note, in violation of 8
>
> U.S.C. § 894.

**COUNT II: CIVIL RICO CONSPIRACY (18 U.S.C. §§1962(d), 1964(c))**

114.   The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

115.   The members of the Massad Enterprise, as above defined, did unlawfully agree and conspire together to perform the illegal acts set forth above in violation of 18 U.S.C. § 1962(d).

116.   Their conduct constituted an ongoing criminal conspiracy.

117.   Said RICO conspiracy caused great damage to the plaintiffs, including, but not limited to losses in excess of approximately $38 million.

**COUNT III: BREACH OF CONTRACT**

**(Gemstone and D. Massad)**

121.   The Plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

122.   The Defendants D. Massad and Gemstone entered into a binding contract which contract included an implied obligation of good faith and fair dealing.

123.   By its conduct set forth above, the defendant breached said contract without excuse or right.

124.   Said breach of contract caused great damage to the plaintiffs, including, but not limited to economic losses.

## COUNT IV: BREACH OF CONTRACT

### (Commerce Bank)

125.   The Plaintiffs repeat and reiterate each and every allegation set forth above
       and incorporate such allegations into this count.

126.   The Commerce Bank entered into a binding contract which contract included
       an implied obligation of good faith and fair dealing.

127.   By its conduct set forth above, the defendant breached said contract without
       excuse or right.

128.   Said breach of contract caused great damage to the plaintiffs, including, but
       not limited to economic losses.

## COUNT IV: INTENTIONAL INTERFERENCE WITH CONTRACT

### (Gemstone D. Massad and P. Massad)

129.   The plaintiffs repeat and reiterate each and every allegation set forth above
       and incorporate such allegations into this count.

130.   The individual defendant s D. Massad and P. Massad controlled the Defendant
       Gemstone.

131.   There were several written contracts between Boston Hill and various
       intending purchasers of real property.

132.   The individual defendant D, Massad knew of the contracts between Boston
       Hill and the various purchasers of property..

133.   The individual defendants P. Massad and D. Massad interfered with the

contract between Boston Hill and its buyers.

134.    Said wrongful interference was without right or justification.

135.    Said tortuous and wrongful interference caused the plaintiffs to suffer great
        damage, including, but not limited to economic losses.

## COUNT V: MISREPRESENTATION/PROMISSORY ESTOPPEL

136.    The Plaintiffs repeat and reiterate each and every allegation set forth above
        and incorporate such allegations into this count.

137.    The Defendants D. Massad and Gemstone made material representations to
        Plaintiffs.

138.    Plaintiffs relied upon the representations of the Defendants.

139.    These representations were false or made with reckless disregard for the truth,
        or with negligent disregard for truth and with the intention of benefiting
        themselves in a manner contrary to law.

140.    Plaintiffs relied to their detriment upon the false and fraudulent
        representations made directly to them,

141.    By said detrimental reliance, Plaintiffs were greatly damaged.

## COUNT VI: UNFAIR AND DECEPTIVE PRACTICES IN VIOLATION OF G.L.

## C.93A

142. The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

143. The defendants each do business within the Commonwealth of Massachusetts.

144. The manner and means described above were unfair and deceptive as defined in G.L. c. 93A §11.

145. As a result of the Defendants' unfair and deceptive business practices, the Plaintiffs suffered in business, in their personal and professional reputations, suffered emotional distress and were otherwise damaged, including, but not limited to losses in excess of approximately $38,000,000.00.

## JURY DEMAND

The Plaintiffs respectfully request a trial by jury to the greatest extent allowed by law.

## PRAYER FOR RELIEF

WHEREFORE; the plaintiffs respectfully request this Honorable Court to:

1. Issue a short order of notice, and hold a hearing following which the Court, per Fed. R. Civ. P. 65 (b) should issue a temporary restraining order enjoining said defendants from selling, transferring, alienating, hypothecating, conveying, or foreclosing or otherwise obtaining any equitable interest in the Boston Hill property located in Shrewsbury, Northborough, and Westborough.

2.      Hold a subsequent or consolidated hearing following which the Court, per Fed. R. Civ. P. 65 (b), should issue a preliminary injunction enjoining said defendants from selling, transferring, alienating, hypothecating, conveying, or foreclosing or otherwise obtaining any equitable interest in the Boston Hill property located in Shrewsbury, Northborough, and Westborough.

3.      Order the defendants jointly and severally to pay all compensatory damages in the greatest amount supported by the law or evidence.

4.      Assess against each defendant the greatest amount of special, exemplary or punitive damages as are supported by law or evidence, including but not limited to such double or treble damages assessed in accord with the terms of 18 U.S.C. § 1964(c) and M.G.L. c. 93A.

5.      Assess against each defendant interest, costs, and attorney fees to the greatest extent permitted by law.

6.      Assess against each defendant such further relief as is mete and just.


Dated: May 30, 2008


                              Respectfully submitted,
                              Plaintiffs,
                              By their attorney,



                              /s/ Earl D. Munroe
                              _____
                              Earl D. Munroe
                              BBO#552853
                              Munroe & Chew
                              5 Broadway
                              Saugus, MA 01906
                              (617) 848-1218