## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES SANDERSON, III INDIVIDUALLY, AND AS TRUSTEE OF THE BOSTON HILL REALTY TRUST<br><br>PLAINTIFFS<br><br>v.<br><br>DAVID G. MASSAD, PAMELA MASSAD, COMMERCE BANK AND TRUST COMPANY, GEMSTONE INVESTMENT CO., INC.<br>DEFENDANTS<br><br>v.<br><br>CHARLES SANDERSON, III, CHARLES SANDERSON, IV, INDIVIDUALLY AND AS TRUSTEES OF THE BOSTON HILL REALTY TRUST | NO:  04:08-cv-40106 |

## VERIFIED AMENDED COMPLAINT AND JURY DEMAND

### NATURE OF THE CASE

1.     This is an action for damages arising under the Racketeer Influence and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  Additionally, the action

includes claims under Massachusetts law. The predicate acts supporting the RICO

counts include, mail fraud, 18 U.S.C. §1341, wire fraud  18 U.S.C. §1343,

racketeering 18 U.S.C. §1952, extortion 18 U.S.C. §1851, extortionate credit

transactions 18 U.S.C. §892, conspiracy to commit extortionate credit transactions,

collection of credit by extortion 18 U.S.C. §894, financing extortionate extensions of

1

credit 18 U.S.C. §893 and the Massachusetts criminal usury law.  The facts alleged also indicate various Massachusetts causes of action including violations of Massachusetts General Law c. 93A.

2.      This action arises from a scheme by which the Defendants conspired to take property away from the Plaintiffs through a scheme of fraud, extortion and deceptions whereby the Plaintiffs were ensnared in a web of transactions with the Defendants designed to place the Plaintiffs in a position of  fearing tremendous financial harm in order to control the Plaintiff's actions, to force the Plaintiffs to continue to enter into extortionate credit transactions, and to continue working on the real estate development so that, Defendants could ultimately take the property from the Plaintiffs.

3.      The Defendants drew the Plaintiffs into their scheme by using an offer for legitimate bank financing through the Defendant Commerce Bank with the intention of inducing the Plaintiffs into reliance on the fact that there would be adequate financing available and not to seek alternate legitimate financing.  At the eleventh hour the Defendants withdrew their credit offer forcing the Plaintiffs into default on their promissory note and mortgage.  The Defendants then secretly acquired the defaulted note and mortgage through their position as a fiduciary to the note and mortgage holder, and then used the defaulted instruments to further their criminal scheme.

4.      The Defendants never intended to allow the Plaintiffs to repay the money being lent it them.  Instead the Defendants intended to use the web of financial transactions

2

to make it impossible for the Plaintiffs to repay the loans and be placed in a position where they were powerless to stop the Defendants from taking the real property by foreclosure.

5.      This enterprise has been directed and controlled by defendants David G. Massad (" D. Massad") and  Pamela Massad ("P. Massad); their lending companies Gemstone Investment Company, Inc. ("Gemstone") and Commerce Bank and Trust Company, ("Commerce") which the Defendants have used, controlled, and directed to commit unlawful acts.  Through their conduct, as described below, the Defendants  conducted or participated, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity, and/or conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. §1961 et. seq.).

6.      As a consequence of the Defendants unlawful conduct, the Plaintiff stand to loose all of their net worth, loose valuable real estate, and for the Plaintiff, Sanderson, to loose his home.

## PARTIES

7.      Plaintiff Charles Sanderson, III ("Sanderson") is an individual who resides in Kingston, Massachusetts.

8.      Plaintiff  Boston Hill Realty Trust ("Boston Hill") is a trust established under the laws of the Commonwealth of Massachusetts under declaration of trust dated May, 2000 and recorded in the Worcester County Registry of Deeds at Book 22598, page 161.

9.      Defendant David G. Massad is an individual who resides in Westborough, Massachusetts.

10.     Defendant Pamela Massad ("Pamela Massad") is an individual who resides in Westborough, Massachusetts.

11.     Defendant Commerce Bank and Trust Company ("Commerce Bank") is a federally insured financial institution headquartered in Worcester, Massachusetts.  Pursuant to information and belief Commerce Bank is a state-chartered commercial bank, and at al times relevant times hereto was engaged in business as such.

12.     Defendant Gemstone Investment Company, Inc. is a Corporation formed under the laws of the Commonwealth of Massachusetts with a principle place of business at Worcester, Massachusetts.

### Jurisdiction and Venue

13.     This Court's jurisdiction is based upon 28 U.S.C. §§1331 and 1332;  15 U.S.C. §78aa; 18 U.S.C. §1964(a); 29 U.S.C. §1132(e)(1); and  applicable principles of supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b) and (d); 15 U.S.C. §78aa; 18 U.S.C. §1965; and 29 U.S.C. §1132(e)(2).

### Facts Common to All Counts

15.     Nicholas J. Fiorillo ("Fiorillo") is an individual who resides in Worcester, Massachusetts. Fiorillo is party to two similar actions (*Fiorillo v. Gamewell*, C.A. # 07-40015-FDS and *Krowel, et al. v. Massad et al.*, C.A. # 07-40122-FDS), and has been victimized by the same RICO conspiracy described below.

16.     Tracy Krowel is an individual who resides in Worcester, Massachusetts. Krowel is party to two similar actions (*Fiorillo v. Gamewell*, C.A. # 07-40015-FDS and

*Krowel, et al. v. Massad et al.*, C.A. # 07-40122-FDS), and has been victimized by the same RICO conspiracy described below.

17.     Robert Depietri Jr. is an individual who resides in Worcester, Massachusetts. R. Depietri is party to a similar action (*Depietri v. Massad*, C.A. # 07-40267-FDS), and has been victimized by the same RICO conspiracy described below.

18.     Kimberly Depietri  is an individual who resides in Worcester, Massachusetts. K. Depietri is party to a similar action (*Depietri v. Massad*, C.A. # 07-40267-FDS), and has been victimized by the same RICO conspiracy described below.

## FACTUAL BASIS FOR CLAIMS

### The Beginning of the Fraudulent Scheme

19.     Early in the year 2000 Sanderson became aware of an opportunity to purchase some commercial estate at the intersection of Route 9 and Route 20 in the towns of Westborough, Shrewsbury and Northborough (hereinafter references as "Property"). Sanderson called his commercial real estate broker, Robert Yale (Yale).  Yale contacted the owners of the property Dorothy Valente and Norman E. Morrison. Yale set up a transaction whereby Sanderson agreed to purchase the property from the Valente and Morrison for $4,000,000.00.  At the time that Valente and Morrison was represented by Attorney Ross Merrow.  Pursuant to information and belief Yale convinced Valente and Morrison to terminate Attorney Merrow and then hire Attorney  Mark Donahue, who is a partner in the law firm of Fletcher Tilton & Whipple (hereinafter "FTW"). Pursuant to information and belief Yale was working with Donahue on various projects . The firm FTW is also the law firm with which the Defendant P. Massad is associated as "of Counsel".

20.    On or about May 16, 2000 Sanderson closed on the transaction with Valente and Morrison and gave them $750,000.00 in cash and signed a promissory note secured by a mortgage for the balance of the purchase price in the amount of $3,250,000.00. (hereinafter collectively "Valente Note") The Valente Note called for payment in full on November 18, 2000.  Sanderson knew that he would not be able to complete the project by that short time, and he also knew that Boston Hill would require financing in order to be able to complete preparation of the sub-division for the sale of lots. Sanderson set about finding financing for his project. (See Note and Mortgage Attached as Exhibit 1).

21.    Because of the size of the Property Sanderson knew that he would need to be able to sell individual parcels and obtain releases from the financing on a lot-release basis.

22.    Sanderson was introduced to D.  Massad.  D. Massad took Sanderson  to the Commerce Bank and told him that Commerce would be interested in financing Sanderson's project at Boston Hill. Unknown to Sanderson at the time D. Massad had intended to use his loan to take the Property from Boston Hill. Pursuant to information and belief D. Massad told his associate and employee that the Boston Hill property was one of the most desirable and import commercial projects in Central Massachusetts and that he (D. Massad) intended to own the project. Pursuant to information and belief,  D. Massad told one of his associates and employees that he had a "sucker", who D. Massad intended to allow to construct the roadway and do all of the work of developing the commercial sub-division and then take the property from Boston Hill in a foreclosure.

23.    On September 25, 2000, the Defendant Commerce Bank issued Boston Hill an

"Expression of Interest" letter indicating that it would loan Boston Hill
$4,750,000.00. (Attached hereto as Exhibit 2).  This letter was sent to Boston Hill
by U.S. Mail and by facsimile transmission.

24.     On October 4, 2000, the Commerce Bank issued a commitment letter to Boston
Hill committing to finance the project and to give Boston Hill a mortgage for
$4,750,000.00 at a rate of 9.5% annual interest. (Attached hereto as Exhibit 2).  The
Loan commitment called for the release of lots on a lot-release basis with the bank
to receive 80% of the sales proceeds, a 5% fee and with 15% of the sales price going
to Boston Hill. This letter was mailed to Boston Hill through the U. S. Mail and by
facsimile transmission.

25.     Subsequently Commerce Bank, in a telephone conversation with Sanderson said
that they were unwilling to provide the promised financing.  The financing
commitment was withdrawn within days of the time that Boston Hill and Sanderson
had to retire the Valente Note. As intended, Sanderson had relied upon the promised
financing by Commerce Bank.  Sanderson had no time to seek alternate financing
prior to the Valente Note default.

26.     On November 15, 2000, Boston Hill and Sanderson defaulted upon the Valente
Note. On April 11, 2001 P. Massad's law firm FTW, brought suit against Sanderson
and Boston Hill on behalf of Morrison and Valente in the Worcester Superior Court,
entitled *Morrison et. al. v. Sanderson* IV Trustee, et. al., docket number
WOCV2001-00739.  On or about August 2, 2001 Valente and Morrison obtained a
judgment authorizing the foreclosure of the mortgage (Valente Note).   (A copy of
the Docket entries for this case are attached hereto as Exhibit 3.)

27.     On or about November 19, 2001 Gemstone purchased the Valente Note from its

owners Morrison, Valente and Olsen.  Pursuant to information and belief, P.
Massad's law firm FTW represented all parties to this transaction.  Pursuant to
information and belief, despite the fact that P. Massad and FTW owed a duty of
fiduciary care to Morrison, Valente and Olsen, and despite that fact that P. Massad
was well aware of  the value of the Property, Gemstone purchased the Valente Note
for a deep discount.  The Defendants kept this transaction secret from the Plaintiffs
by not recording the assignment of mortgage in the registry of deeds until April 4,
2002.  (A copy of the Assignment of Mortgage as recorded is attached hereto as
Exhibit 4.)

28.     The Defendants wanted to keep the purchase of the Valente Note a secret
because they wanted the Plaintiffs to continue to work on the engineering and road
construction at the Property.  By February of 2001 Sanderson and Boston Hill were
out of funds for road construction and were unsuccessful in their attempts to find
financing.  Being in default and under threat of foreclosure made it impossible for
Sanderson  to find financing for Boston Hill.  D. Massad  told Sanderson that he had
some money of his own that he would lend to Sanderson and Boston Hill to retire
the Valente Note.  He said that the interest rate would be 15% annually. Sanderson
and Boston Hill was under tremendous financial distress so Sanderson agreed to
borrow the money from D. Massad.  Unknown to Sanderson at the time that the
interest for the loan would also include an undisclosed $900,000.00 fee and
conveyance of a lot of land worth approximately $1,000,000.00.  (A Copy of the
$2,900,000.00 Note is attached hereto as Exhibit 5.)

29.     Subsequently the Defendants recorded the Valente Note and made it know to
Sanderson that they were now the holder, and that they had the right to foreclose the

Valente Note at any time.  Although D. Massad assured Sanderson not to worry about the term of the note or the fact that the note was in excess of the amount actually paid by Gemstone, he would soon use the instrument to extort property from Sanderson.

30.     Shortly after making know to Sanderson that he, D. Massad, controlled the Valente Note he used the threat of foreclosure to extort a deed to a lot from Boston Hill for no consideration.  He also used the threat of foreclosure to compel Sanderson to sign an amendment of the $2,900,000.00 note to make it comply with federal law on the face of the document.  Although a deed was given to D. Massad, the deed was never recorded in the Worcester Registry of Deeds. (A copy of the Amended Note is attached hereto as Exhibit 6).

31.     On or about June 23, 2004 the Defendants D. Massad and P. Massad again used the threat of foreclosure to convey a lot of property, this time to Gemstone.  The deed was prepared by P. Massad at FTW and was sent to Sanderson by U.S. mail on or about May 28, 2004.  ( A copy of the transmittal letter from P. Massad is attached as Exhibit 7).  Sanderson executed the deed and gave it to his attorney, Donna Truex at the law firm of Bowditch & Dewey.  Unknown to Sanderson at the time, the managing partner of Bowditch & Dewey, Michael Angelinni, was the personal lawyer for the Defendant D. Massad and served on the Board of Directors of the Defendant Commerce Bank.  The deed was recorded at the Worcester County Deeds on August 6, 2004, at Book 34321, page 201. ( A copy of the recorded deed is attached hereto as Exhibit 8).

**Continuation of the Conspiracy to Induce the Plaintiffs to**
**To Work on the Property and Increase its Value**

32.     In order to persuade the Plaintiffs to continuing the project and enhance the value of the Property, the Defendants D. Massad, P. Massad and Gemstone continued to loan money to the Plaintiffs.  However, they only loaned the minimum amount necessary for the Plaintiffs to continue with the road construction and the construct a necessary sewage pumping station.  Always looming was the prospect that Gemstone would foreclose on the Valente Note.  In this way the D. Massad controlled the Plaintiffs and in essence cause them to continue to work for free on the completion of the project.  In reality the true interest rate on the loans to the Plaintiff was undisclosed because D. Massad and his co-conspirators intended to take the entire project in payment on the loans.  In addition to the treat of foreclosure D. Massad used deceit to cause the Plaintiffs to continue with the project.  D. Massad represented to Sanderson that they would release lots on the lot-release basis.  There were eight lots along Route 20 and Walnut Street in Shrewsbury, Massachusetts. D. Massad had agreed with Sanderson to release each of these lots upon the payment of $250,000.00, per lot, and allowing Boston Hill retain the excess for the purpose of funding the remainder of the construction project. In addition there was a residential sub-division within the project.  D. Massad agreed to release this area in exchange for $1,000,000.00.

33.     Unknown to the Plaintiffs by this time the Defendants were representing to third party real estate developers that the project belongs to them and were attempting to sell the project.  Pursuant to information and belief, the Defendants had no intention

of releasing these lots for sale or of doing anything that would permit the Plaintiffs
to pay off the notes and redeem their equity in the Property.

### The Wes-Pac Purchase and Sale Agreement

34.     Based upon the promises of D. Massad Sanderson set about to sell the lots along
Route 20.  The first deal Sanderson made for Boston Hill was with Wes-Pac for the
sale of approximately two acres of land for the sum of $1,140,000.00. (A copy of
the Wes-Pac agreement is attached  as Exhibit 9.) D. Massad was involved in the
initial and in many of the subsequent meeting with Wes-Pac. D. Massad agreed to
release the Wes-Pac lot on a lot-release basis upon the payment of $250,000.00,
pursuant to his understanding with Sanderson.

35.     Wes-Pac went to the Town of Shrewsbury and obtained all of the necessary
permits to construct a Shell Gasoline Station. Wes-Pac engaged professionals to
performed engineering, take core samples, make architectural drawings and
expended substantial funds getting the permits for the construction of the station.
Ultimately, D. Massad and P. Massad refused to follow through with this deal and
he refused to release the lot.  As a result of not being able to convey clear title.
Wes-Pac has brought an action against Boston Hill in the State Courts of
Massachusetts to recover its costs related to this project.

### The Abu Construction Inc. Purchase and Sale Agreement

36.     On or about December 2, 2003 Boston Hill entered into a purchase and sale
agreement with Abu Construction, Inc. for the sale of a parcel of the Property which
we had set aside as a residential sub-division for the sum of  $2,000,000.00.  (A
copy of the Abu Purchase and Sale agreement is attach as Exhibit 10.) D. Massad

agreed to release the land for $1,000,000.00 and agreed to allow Boston Hill to retain $1,000,000.00 from the proceeds of the sale.  D. Massad had brought this purchaser to Sanderson and D. Massad was involved in the meetings for the sale of the property.  Abu Construction Inc. posted a deposit to be held in escrow and obtained all necessary permits for the construction of the residential sub-division. Abu expended substantial funds in obtaining permits from the Town of Shrewsbury.

37.    When the parties were ready to close the transactions D. Massad and P. Massad refused to release the lot. D. Massad had once again failed to follow through on his promises to Sanderson. As a direct result of the actions of D. Massad and P. Massad, Boston Hill was unable to deliver clear title to Abu and was forced to return the deposit.

### The Cadette Purchase and Sale Agreement

38.    On or about September 18, 2003 Boston Hill entered into an agreement with George Cadette for the sale of a lot for the construction of a Dunkin-Donuts shop for the sum of $500,000.00.  (A copy of the Cadette Purchase and Sale Agreement is attached as Exhibit 11.) This lot was one of the eight lots that D. Massad had agreed to release for $250,000.00, per lot. Cadette worked to obtain the necessary permits and performed his due diligence on the property.

39.    When the parties were ready willing and able to close the transactions the Defendants A. Massad. P. Massad refused to release the lot from the mortgages. As a direct result of the Defendants' action Boston Hill was unable to deliver clear title to Cadette and was forced to return the deposit.

### The RWW Management Company Purchase and Sale Agreement

40.     On or about December 18, 2003 the Boston Hill entered into an agreement with
RWW Management Company for the sale of approximately five acres of land for
the construction of a Mercedes Benz automobile dealership for the sum of
$1,800,000.00.  (A Copy of the RWW Purchase and Sale Agreement is attached as
Exhibit 12.) This property was comprised of three of the Route 20 lots that D.
Massad had agreed to release for $250,000.00. D. Massad agreed to release the land
from the mortgages on a lot release basis in consideration of $750,000.00.

41.     RWW Management performed its due diligence on the land necessary to obtain
its permits. When the parties were ready willing and able to close the transactions
the Defendants A. Massad. And P. Massad refused to release the lots from the
mortgages. As a direct result of the Defendants' action Boston Hill was unable to
deliver clear title to RWW Management and was forced to return the deposit.

### The First Hartford Purchase and Sale Agreement

42.     On or about April 1, 2004 Boston Hill entered into an agreement with First
Hartford Realty Corporation for the sale of approximately eighty-eight acres for the
sum of $13,000,000.00. (A copy of the First Hartford Purchase and Sale Agreement
is attached as Exhibit 13.) The agreement gave the purchaser First Hartford time to
perform substantial and expensive engineering on the property. Because the
Defendants had breached the agreement with Sanderson to release the lots along
Route 20 Boston Hill did not have funds necessary to comply with its agreement
with First Hartford. The agreement required Boston Hill to complete construction of

the roadways, install a traffic light and finish the improvements to Route 20 required by the town.  As a direct result of the actions of the Defendants Plaintiffs were forced into default of their agreement with First Hartford.

43.    First Hartford brought a lawsuit against Boston Hill. Sanderson was forced to place a mortgage on his home to pay First Hartford approximately $500,000.00. Now Sanderson is in foreclosure on this mortgage and it is possible that he will loose his home.

### Defendants Refuse to Release Lots

44.    On or about April 26, 2006 Sanderson, through his attorney, Donna Truex prepared and forwarded to P. Massad several partial mortgage releases to allow the Plaintiff to consummate the agreements detailed above.  Without providing any explanation, P. Massad and Gemstone flatly refused to release any lots from the mortgage, with the exception of the one lot that they had extorted from the Plaintiffs.

### Defendants Attempt To Extort Money From Plaintiffs

45.    On or November 2007 the Defendants had scheduled a foreclosure sale of the Property.  Sanderson went to meet with D. Massad at his office to ask for a continuance of the foreclosure sale.  D. Massad told Sanderson that if Sanderson put one million dollars in cash on his desk that Gemstone would give Sanderson and Boston Hill additional time before the foreclosure sale. When Sanderson told D.

14

Massad that he did not have one million dollars, D. Massad said that the foreclosure would go forward.  Sanderson filed a Chapter 11 Bankruptcy to stop the foreclosure sale.  The Chapter 11 case was dismissed by the court because Boston Hill was late in filing its petition schedules and statement of financial affairs.  As soon as the case was dismissed the Defendants scheduled another foreclosure.  Sanderson caused a second bankruptcy case to be filed.  Sanderson petitioned the bankruptcy court to dismiss the second case.

46.    On or about May, 2008 Sanderson went to visit D. Massad again to ask for some time to sell the Property or to get investors to pay off the Gemstone Mortgages.  D Massad told Sanderson that he would wait six months before the foreclosure.  When Sanderson asked D. Massad to put the promise in writing he refused.  In May, 2008 in a telephone conversation between Sanderson, Russell Kellcourse and D. Massad, Massad said that he would give Boston Hill a short extension of the foreclosure if Sanderson gave him $250,000.00 in cash.

## COUNT I: CIVIL RICO (18 U.S.C. §1961 et seq.)

47.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

48.    At all relevant times D. Massad  was a person within the meaning of RICO, 18 U.S.C. §§1961 (3) and 1964(c).

49.    At all relevant times P. Massad  was a person within the meaning of RICO, 18 U.S.C. §§1961 (3) and 1964(c).

15

50.     At all relevant times Commerce Bank was a person within the meaning of RICO, 18 U.S.C. §§1961 (3) and 1964(c).

51.     At all relevant times Gemstone was a person within the meaning of RICO, 18 U.S.C. §§1961 (3) and 1964(c).

52.     At all pertinent times, the defendants D. Massad, P. Massad, Gemstone and  Commerce Bank, combined to form an "enterprise" as that term is defined at 18 U.S.C. §1961(4) ("the Massad Enterprise").

53.     At all relevant times this enterprise was engaged in, and its activities affect, interstate commerce within the meaning of RICO. 18 U.S.C. §1962(c).

54.     At all relevant times this enterprise and the defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(5) in violation of 18 U.S.C. §1962(c).

55.     Specifically, at all relevant times, the Defendants engaged in racketeering activity within the meaning of 18 U.S.C. §1961(1) by engaging in the acts set forth above.  The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. §1341 (Mail Fraud); 18 U.S.C. §1343 (Wire Fraud); 18 U.S.C. §1952 (Racketeering by Federal Extortion) 18 U.S.C. §892 (Extortionate Credit Transactions); 18 U.S.C. §892 (Conspiracy to commit Extortionate Credit Transactions); 18 U.S.C. §893 (Financing Extortionate Credit Transactions); 18 U.S.C. §894 (Collection of Credit by Extortion); 18 U.S.C. 1851 (Hobbs Act).

56.     The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).  The acts alleged were related to each other by virtue of common participants, common victims, a common method of

commission, and the common purpose and common result of extorting and defrauding the Plaintiffs and enriching the conspirators at the expense of the Plaintiffs while concealing the Defendants fraudulent and unlawful activities.

57.     The Massad Enterprise is a group of individuals and corporations associated in fact, although it is not a legal entity. The means and methods utilized to conduct its organized crime activity included a pattern of extortion, threats, intimidation and economic duress, which had the effect of fraudulently transforming conforming loans into usurious ones. The unlawful actions of the defendants occurred on a continuing basis from at least 2000 to the present. The defendants have conspired to defraud and extract large sums of  money and valuable real property from the plaintiffs by engaging in the pattern of activity that consists of numerous crimes as set forth below.

58.     The purpose of the enterprise was as follows:

  a.     to enrich its members;

  b.     to preserve, protect, and augment its financial power and leverage in central Massachusetts.

59.     Among the means and methods employed by the members and associates of the Massad Enterprise in the conduct of the enterprise were the following:

  a.     members and associates conspired committed and attempted to commit mail fraud , wire fraud and loan sharking;

  b.     members and associates engaged in extortionate acts to enrich its members;

  c.     members and associates obstructed and attempted to obstruct justice to prevent victims of the Massad Enterprise from seeking redress in the

courts.

60.     The individual members of the Massad Enterprise caused the corporate members
        to write loan commitment to the Plaintiff. When the loans were about to close, the
        Defendants withdrew the offer of financing and then offer the Plaintiff loans, the
        terms of which were substantially less favorable to the Plaintiffs and which
        transactions were intended to deprive the Plaintiffs of the real estate loaned upon.

61.     The individual members of the Massad Enterprise would lull the Plaintiff into a
        false sense of security by approving transactions and promising to the release of
        parcels of real estate from the financings only to later back out of theses agreements.
        This pattern of behavior was intended to impose severe economic duress on the
        Plaintiffs so that they would be unable to repay the loans and that the Massad
        Enterprise would be able to obtain the real property by foreclosure.

62.     The individual members, on one or more occasion, also use the economic duress
        to compel the Plaintiff to convey valuable real property to the Massad Enterprise at no
        consideration.

63.     In at least one instance,  some or all of the defendants extorted a debt from
        Boston Hill that was statutorily usurious, in violation of G.L. c. 271 §49 and 18
        U.S.C. §1961(6). One or more members of the Massad Enterprise persisted in efforts
        to collect this usurious debt.   P. Massad used the U.S. Mail in the furtherance of this
        scheme.

64.     All of the predicate acts of racketeering activity are directly related loaning

money to real estate developers for the purpose of foreclosing on their property.

65.    All of the predicate acts of racketeering activity are part of the nexus of the affairs
and functions of the racketeering enterprise.

66.    The Defendants were enabled to commit the predicate offenses by virtue of their
position in the enterprise or involvement in or control over the affairs of the
enterprise.

67.    All of the predicate acts of racketeering activity occurred after the effective date
of 18 U.S.C. Section 1961 et. seq.

68.    The predicate acts of racketeering activity began on or about May 16, 2000.

69.    The pattern of racketeering activity is currently ongoing and open ended, and
threatens to continue indefinitely unless this Court enjoins the racketeering activity.

70.    Numerous schemes have been completed involving repeated criminal conduct that
by its nature projects into the future with a threat of repetition.

71.    The predicate acts have the same or similar purposes, results, participants,
victims, and methods of commission.

**Summary Of Each Defendant's Association With The Racketeering Enterprise And
Participation In The Pattern Of Racketeering Activity**

72.    At all times herein the defendants made numerous interstate telephone calls, in the

course of business, for purposes of carrying out the various schemes detailed infra.

73.    Defendant Commerce Bank & Trust Company was associated with the

racketeering enterprise as follows:

      a.    pursuant to 18 U.S.C. 1962(c), by conducting or participating directly in

the conduct of the racketeering enterprise through a pattern of racketeering

activity by committing at least violations of 18 U.S.C 1341, mail fraud as

detailed infra;

      b.    and/or 18 U.S.C. 1962(d) by conspiring to violate any of the provisions of

18 U.S.C. 1962;

      c.    and/or aiding and abetted in the commission of at least two predicate

offenses which were part of the pattern of racketeering in violation of the

common law doctrine of aiding and abetting.

74.    Defendant D. Massad, was associated with the racketeering enterprise as its

primary manager, and violated:

      a.    18 U.S.C. 1962(a) by using or investing, directly or indirectly, proceeds

for the operation of the racketeering enterprise which were received from

a pattern of racketeering which the defendant participated as principal by

committing numerous violations of [extortion], [securities fraud], [wire

fraud] and [mail fraud] as detailed infra;

      b.    and/or  18 U.S.C. 1962 (b) by acquiring and/or maintaining an interest in

or control of the racketeering enterprise by a pattern of racketeering

activity consisting of numerous violations of 18 U.S.C. §1951 [Hobbs Act], 18 U.S.C. §1343 [wire fraud], and 18 U.S.C. §1341 [mail fraud]; 18 U.S.C. §§891-894 [loan sharking] as detailed infra;

c.   and/or  18 U.S.C. 1962(c) by conducting or participating directly in the conduct of the racketeering enterprise through a pattern of racketeering activity by a pattern of racketeering activity consisting of numerous RICO predicates including, without limitation:

   i.   18 U.S.C.§1951 (Hobbs Act) by using the threat of financial harm to extort the Plaintiffs in deeding valuable property to himself and to Gemstone as detailed infra;

   ii.   18 U.S.C. §1341 (Mail Fraud) by using the U.S. Mails in the furtherance of his extortion of property (deeds) from the plaintiffs, as detailed infra;

   iii.   18 U.S.C. §1343 (Wire Fraud) by using telephone service in the furtherance of his extortion of property (deeds) from the plaintiffs, as detailed infra;

   iv.   18 U.S.C. §894 (collection of credit by extortionist means) in connection with his extortion of  property (deeds) from the Plaintiffs as detailed infra;

   v.   18 U.S.C. §1952 (Racketeering) in connection with the actions described infra;

vi.   18 U.S.C.§1951 (Hobbs Act) by using the threat of financial harm
      to extort money from the Plaintiffs in 2007 and 2008 as detailed
      infra;

vii.  18 U.S.C. §1343 (Wire Fraud) by using telephone service in the
      furtherance of his scheme of extortion of money  from the
      Plaintiffs in 2007 and 2008,  as detailed infra;

viii. 18 U.S.C. §1952 (Racketeering) in connection with the actions
      described infra;

ix.   18 U.S.C. §892 (extortionist credit transactions) in connection with
      the $2,900,000.00 loan, and other loan transactions, as detailed
      infra;

x.    18 U.S.C. §892 (conspiracy to commit extortionate credit
      transactions) in connection with the $2,900,000.00 loan, and other
      loan transactions, as detailed infra;

xi.   18 U.S.C. §893 (Financing extortionate credit transactions) in
      connection with the $2,900,000.00 loan and other loan
      transactions;

xii.  Massachusetts General Laws c. 271 §49 (Usury) in connection
      with the $2,900,000.00 loan, and other loan transactions;

d.  18 U.S.C. 1962(d) by conspiring to violate any of the provisions of 18
    U.S.C. 1962; and/or aided and abetted in the commission of at least two

predicate offenses which were part of the pattern of racketeering in violation of the common law doctrine of aiding and abetting.

75.     Defendant P. Massad, was associated with the racketeering enterprise as its primary manager, and violated:

    a.  18 U.S.C. 1962(a) by using or investing, directly or indirectly, proceeds for the operation of the racketeering enterprise which were received from a pattern of racketeering which the defendant participated as principal by committing numerous violations of [extortion], [securities fraud], [wire fraud] and [mail fraud] as detailed infra; and/or

    b.  18 U.S.C. 1962 (b) by acquiring and/or maintaining an interest in or control of the racketeering enterprise by a pattern of racketeering activity consisting of numerous violations of 18 U.S.C. §1951 [Hobbs Act], 18 U.S.C. §1343 [wire fraud], and 18 U.S.C. §1341 [mail fraud]; 18 U.S.C. §§891-894 [loan sharking] as detailed infra; and/or

    c.  18 U.S.C. 1962(c) by conducting or participating directly in the conduct of the racketeering enterprise through a pattern of racketeering activity by a pattern of racketeering activity consisting of numerous RICO predicates including, without limitation:

        i.  18 U.S.C.§1951 (Hobbs Act) by using the threat of financial harm to extort the Plaintiffs in deeding valuable property to herself and to Gemstone as detailed infra;

ii.   18 U.S.C. §1341 (Mail Fraud) by using the U.S. Mails in the furtherance of her extortion of property (deeds) from the plaintiffs, as detailed infra;

iii.   18 U.S.C. §1343 (Wire Fraud) by using telephone service in the furtherance of her extortion of property (deeds) from the plaintiffs, as detailed infra;

iv.   18 U.S.C. §894 (collection of credit by extortionist means) in connection with her extortion of  property (deeds) from the Plaintiffs as detailed infra;

v.   18 U.S.C. §1952 (Racketeering) in connection with the actions described infra;

vi.   18 U.S.C. §892 (extortionist credit transactions) in connection with the $2,900,000.00 loan, and other loan transactions, as detailed infra;

vii.   18 U.S.C. §892 (conspiracy to commit extortionate credit transactions) in connection with the $2,900,000.00 loan, and other loan transactions, as detailed infra;

viii.   Massachusetts General Laws c. 271 §49 (Usury) in connection with the $2,900,000.00 loan, and other loan transactions;

d.   18 U.S.C. 1962(d) by conspiring to violate any of the provisions of 18 U.S.C. 1962; and/or

     e.   aided and abetted in the commission of at least two predicate offenses which were part of the pattern of racketeering in violation of the common law doctrine of aiding and abetting.

76.    Defendant Gemstone, was associated with the racketeering enterprise as its primary manager, and violated:

     a.   18 U.S.C. 1962(a) by using or investing, directly or indirectly, proceeds for the operation of the racketeering enterprise which were received from a pattern of racketeering which the defendant participated as principal by committing numerous violations of [extortion], [securities fraud], [wire fraud] and [mail fraud] as detailed infra; and/or

     b.   18 U.S.C. 1962 (b) by acquiring and/or maintaining an interest in or control of the racketeering enterprise by a pattern of racketeering activity consisting of numerous violations of 18 U.S.C. §1951 [Hobbs Act], 18 U.S.C. §1343 [wire fraud], and 18 U.S.C. §1341 [mail fraud]; 18 U.S.C. §§891-894 [loan sharking] as detailed infra; and/or

     c.   18 U.S.C. 1962(c) by conducting or participating directly in the conduct of the racketeering enterprise through a pattern of racketeering activity by a pattern of racketeering activity consisting of numerous RICO predicates including, without limitation:

i.    18 U.S.C. §1951 (Hobbs Act) by using the threat of financial harm to extort the Plaintiffs in deeding valuable property to Gemstone as detailed infra;

ii.   18 U.S.C. §1341 (Mail Fraud) by using the U.S. Mails in the furtherance of its extortion of property (deeds) from the plaintiffs, as detailed infra;

iii.  18 U.S.C. §1343 (Wire Fraud) by using telephone service in the furtherance of its extortion of property (deeds) from the plaintiffs, as detailed infra;

iv.   18 U.S.C. §894 (collection of credit by extortionist means) in connection with her extortion of  property (deeds) from the Plaintiffs as detailed infra;

v.    18 U.S.C. §1952 (Racketeering) in connection with the actions described infra;

vi.   18 U.S.C. §892 (extortionist credit transactions) in connection with the $2,900,000.00 loan, and other loan transactions, as detailed infra;

vii.  18 U.S.C. §892 (conspiracy to commit extortionate credit transactions) in connection with the $2,900,000.00 loan, and other loan transactions, as detailed infra;

viii. Massachusetts General Laws c. 271 §49 (Usury) in connection with the $2,900,000.00 loan and other loan transactions;

d. 18 U.S.C. 1962(d) by conspiring to violate any of the provisions of 18 U.S.C. 1962; and/or

e. aided and abetted in the commission of at least two predicate offenses which were part of the pattern of racketeering in violation of the common law doctrine of aiding and abetting.

**COUNT II: CIVIL RICO CONSPIRACY (18 U.S.C. §§1962(d), 1964(c))**

77. The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

78. At all relevant times the Boston Hill and Sanderson were each a "person" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

79. At all relevant times the Defendants were each a person within the meaning of RICO, 18 U.S.C. §§1961(3) and 1962(d).

80. At All relevant times Commerce Bank, P. Massad, D. Massad and Gemstone formed an association-in-fact for the purpose of defrauding the Plaintiffs. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

81. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §1962(c)

82. As set out in Count I, each of the Defendants associated with this enterprise conducted or participated directly or indirectly, in the conduct of the enterprise's

affairs through a "pattern of racketeering activity" within the meaning of RICO, 18

U.S.C. §1961(5), in violation of RICO, 18 U.S.C. 1962(c).

83.    At all relevant times, the Defendants each were associated with the enterprise and

agreed and conspired to violate 18 U.S.C. §1962(c), that is, agreed to conduct,

participate, directly and indirectly, in the conduct of the affairs of the enterprise

through a pattern of racketeering activity, in violation of U.S.C. §1962(c).

84.    The Defendants committed and caused to be committed a series of overt acts in

furtherance of the conspiracy and to affect the objects thereof, including but not

limited to the acts set forth above.

85.    As a result of the Defendants' violation of 18 U.S.C. §1962(d) the Plaintiffs have

suffered a loss of property, money, and business.

86.    As a result of the conspiracy, the Defendants are liable to the Plaintiffs for their

losses in an amount to be determined at trial.

87.    Pursuant to RICO, 18 U.S.C. §1964(c), the Plaintiffs are entitled to recover

threefold their damages plus costs and attorney's fees from the Defendants.


### COUNT III: BREACH OF CONTRACT
### (Gemstone and D. Massad)


88.    The Plaintiffs repeat and reiterate each and every allegation set forth above and

incorporate such allegations into this count.

89.    Gemstone and D. Massad entered into a binding contract which contract included

an implied obligation of good faith and fair dealing.

90.    By its conduct set forth above, the defendant breached said contract without excuse or right.

91.    Said breach of contract caused great damage to the plaintiffs, including, but not limited to economic losses.

## COUNT IV: BREACH OF CONTRACT

### (Commerce Bank)

92.    The Plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

93.    The Commerce Bank entered into a binding contract which contract included an implied obligation of good faith and fair dealing.

94.    By its conduct set forth above, the defendant breached said contract without excuse or right.

95.    Said breach of contract caused great damage to the plaintiffs, including, but not limited to economic losses.

## COUNT IV: INTENTIONAL INTERFERENCE WITH CONTRACT

### (Gemstone D. Massad and P. Massad)

96.    The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

97.    The individual defendant s D. Massad and P. Massad controlled the Defendant Gemstone.

98.    There were several written contracts between Boston Hill and various intending

       purchasers of real property.

99.    The individual defendant D, Massad knew of the contracts between Boston Hill

       and the various purchasers of property..

100.   The individual defendants P. Massad and D. Massad interfered with the  contract

       between Boston Hill and its buyers.

101.   Said wrongful interference was without right or justification.

102.   Said tortuous and wrongful interference caused the plaintiffs to suffer great

       damage, including, but not limited to economic losses.


**COUNT V: MISREPRESENTATION/PROMISSORY ESTOPPEL**


103.   The Plaintiffs repeat and reiterate each and every allegation set forth above and

       incorporate such allegations into this count.

104.   The Defendants D. Massad and Gemstone made material representations to

       Plaintiffs.

105.   Plaintiffs relied upon the representations of the Defendants.

106.   These representations were false or made with reckless disregard for the truth, or

       with negligent disregard for truth and with the intention of benefiting themselves in a

       manner contrary to law.

107.   Plaintiffs relied to their detriment upon the false and fraudulent representations

       made directly to them,

108.   By said detrimental reliance, Plaintiffs were greatly damaged.

## COUNT VI: UNFAIR AND DECEPTIVE PRACTICES IN VIOLATION OF G.L.

## C.93A

109.   The plaintiffs repeat and reiterate each and every allegation set forth above and incorporate such allegations into this count.

110.   The defendants each do business within the Commonwealth of Massachusetts.

111.   The manner and means described above were unfair and deceptive as defined in G.L. c. 93A §11.

112.   As a result of the Defendants' unfair and deceptive business practices, the Plaintiffs suffered in business, in their personal and professional reputations, suffered emotional distress and were otherwise damaged, including, but not limited to losses in excess of approximately $38,000,000.00.

## JURY DEMAND

The Plaintiffs respectfully request a trial by jury to the greatest extent allowed by law.

## PRAYER FOR RELIEF

WHEREFORE; the plaintiffs respectfully request this Honorable Court to:

1.   Issue a short order of notice, and hold a hearing following which the Court, per Fed. R. Civ. P. 65 (b) should issue a temporary restraining order enjoining said defendants from selling, transferring, alienating, hypothecating, conveying, or foreclosing or otherwise obtaining any equitable interest in the Boston Hill property located in Shrewsbury, Northborough, and Westborough.

2.      Hold a subsequent or consolidated hearing following which the Court, per Fed. R. Civ. P. 65 (b), should issue a preliminary injunction enjoining said defendants from selling, transferring, alienating, hypothecating, conveying, or foreclosing or otherwise obtaining any equitable interest in the Boston Hill property located in Shrewsbury, Northborough, and Westborough.

3.      Order the defendants jointly and severally to pay all compensatory damages in the greatest amount supported by the law or evidence.

4.      Order the dissolution of the mortgages on the property held by the Defendant Gemstone.

5.      Awarding the Plaintiffs the costs, expenses and attorney's fees incurred in prosecuting this action.

6.      Assess against each defendant the greatest amount of special, exemplary or punitive damages as are supported by law or evidence, including but not limited to such double or treble damages assessed in accord with the terms of 18 U.S.C. § 1964(c) and M.G.L. c. 93A.

7.      Assess against each defendant interest, costs, and attorney fees to the greatest extent permitted by law.

8.      Assess against each defendant such further relief as is mete and just.


Dated: June 9, 2008



                                        Respectfully submitted,
                                        Plaintiffs,
                                        By their attorney,



                                        /s/ Earl D. Munroe
                                        _____
                                        Earl D. Munroe
                                        BBO#552853
                                        Munroe & Chew
                                        5 Broadway
                                        Saugus, MA 01906
                                        (617) 848-1218

## VERIFICATION

I, Charles T. Sanderson, III, a citizen of the United States and a resident of the State of Massachusetts. I have read the foregoing Verified Amended Complaint and request for Injunctive Relief and declare under penalty of perjury under the laws of the United States of America that the foregoing factual averments are true and correct to the best of my knowledge and belief.

Charles T. Sanderson, III